FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JAN - 4 2001

*Robert M. March*
CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AL LUCKETT, JR. and CULTURAL ASSETS II, LLC,

                    Plaintiffs,

vs.

SOTHEBY'S, INC.,

                    Defendant.

CIV. 98-1426 LH/LCS-ACE

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's December 6, 2000 Order (the "Order"), counsel have conferred and defendant Sotheby's, Inc. submits herewith its proposed findings of fact and conclusions of law upon which the parties do not agree. Those findings of fact upon which the parties agree are set forth in the pretrial order filed separately. There are no conclusions of law upon which the parties agree.

### SOTHEBY'S PROPOSED FINDINGS OF FACT

1. In December 1995, Luckett owed approximately $1 million in principal and interest on a loan held by the Bank of Boulder. The loan was secured by all of Luckett's assets, including the Collection ultimately consigned to Sotheby's.

2. Bank of Boulder sued to foreclose on the loan. To avoid foreclosure of the assets securing the loan, Luckett helped arrange for a group called Rosette Partners ("Rosette") to purchase the loan from the bank for $500,000.



NY1:\986249\01\L4ZT01!.DOC\66930.0183

3. After acquiring the loan, Rosette entered into an Agreement in Lieu of Foreclosure, dated December 29, 1995, with Luckett under which Rosette agreed not to foreclose on the loan in exchange for Luckett's conveyance to Rosette of a portion of the collateral that secured the loan.

4. The collateral Luckett conveyed to Rosette pursuant to the Agreement in Lieu of Foreclosure included, but was not limited to, the Collection.

5. In his 1995 federal tax return, Form 8275, filed on March 11, 1996, Luckett swore that the collateral transferred to Rosette had a fair market value of $500,000 and an inventory value of $1,012,773. The $500,000 figure was adjusted to $422,227 in Luckett's 1997 federal tax return.

6. In January 1996, Rosette conveyed the collateral it received from Luckett to the Zaplin-Lampert Gallery ("Zaplin-Lampert") in Santa Fe.

7. In his insurance policy effective February 23, 1997, Luckett valued the contents of his home at $305,500.

8. From January 1996 through the time of the consignment of the Collection to Sotheby's in July 1997, few of the materials were sold by Zaplin-Lampert.

9. In early 1997, one of the Rosette partners grew impatient and brought pressure on Zaplin-Lampert to sell the materials.

10. In February 1997, Luckett offered to sell the Collection (minus three items) plus approximately 100 additional items to Pytka for $2 million.

11. Pytka did not consummate the transaction with Luckett because the $2 million price was too high.

12. Luckett approached several auction houses about consigning the Collection. Christies was not interested. Butterfield's, a California auction house, was interested but, according to Luckett, did not fully appreciate the Collection and valued it too low. Luckett then turned to Sotheby's.

13. Immediately prior to the consignment of the Collection to Sotheby's, Luckett did not own the Collection -- Zaplin-Lampert did.

14. On June 23, 1997, Luckett created Cultural Assets II and conveyed to it his collection of Native American artifacts.

15. Paragraph 2 of the Exchange Agreement states as follows:

**Price**. The price at which the [Zaplin-Lampert] Gallery is willing to deliver the Collection to the [Cultural Assets II] LLC is Six Hundred Thousand Dollars ($600,000.00). (Emphasis in original.).

16. Paragraph 3 of the Exchange Agreement states as follows:

**Payment in Kind**. The LLC hereby warrants and represents that the fair market value of the Property that it is willing to transfer to the Gallery in exchange for the Collection is no more than Six Hundred Fifth [sic] Thousand Dollars (650,000.00), but no less than Five Hundred Fifty Thousand Dollars ($550,000.00), as is attested to by the appraisal of Bernard Ewel attached hereto as Exhibit "C". (Emphasis in original.).

17. When Sotheby's personnel met with Luckett in late June and early July 1997, they told Luckett that Sotheby's had no expertise in Southwestern antiques,

had never before conducted an auction of such material and that no such auction had ever been held in New York. They also told Luckett that they were relying on him in creating estimate ranges for valuing the Collection.

18. Luckett was told from the outset of his dealings with Sotheby's that the Collection was a new area for Sotheby's and that his assistance would be required.

19. Luckett insisted that the auction be conducted in New York.

20. Luckett was represented by Fred Schwendimann of the Albuquerque law firm of Hinkle, Cox, Eaton, Coffield & Hensley in the negotiation of the Loan and Consignment Agreement (the "Agreement").

21. Prior to execution of the final version of the Agreement on July 24, 1997, Luckett discussed specific provisions of the Agreement with Schwendimann on at least three separate occasions.

22. In response to Luckett's requests, several provisions in the draft Agreement were modified.

23. Luckett initialed every page of the Agreement, which he executed on behalf of Cultural Assets II.

24. Paragraph 1(d) of the Agreement provides that:

You [Cultural Assets II] agree that the Property will be held and offered by Sotheby's as SFS' pledge agent at public auction on the following terms and subject to the Terms of Guarantee and the Conditions of Sale in effect at the time of the auction. You acknowledge that you have received

and read the Terms of Guarantee and Conditions of Sale of Sotheby's currently in effect.

25. Paragraph 10 of the Agreement provides in part that:

There will be a 20% service charge on the cost of any services performed by others and paid by Sotheby's or SFS, as the case may be, for your [Cultural Assets II'] account.

26. Paragraph 16 of the Agreement provides that:

**Estimates: Catalogue Descriptions**. Presale estimates, if any, are intended only as guides for prospective bidders. Neither Sotheby's nor SFS makes any representation or warranty of the anticipated selling price of any Property, and no estimate anywhere by Sotheby's or SFS of the selling price of any Property may be relied upon as a prediction or guarantee of the actual selling price. Estimates included in receipts, this Agreement, catalogues or elsewhere are preliminary only and subject to revision by Sotheby's from time to time in its sole discretion.

Neither Sotheby's not SFS will be liable for any errors or omissions in catalogue or other descriptions of Property. Neither Sotheby's nor SFS makes any guarantees, representations or warranties whatsoever to you with respect to the Property, its authenticity, condition, value or otherwise.

27. Luckett agreed to all of the lowered estimates prior to the auction.

28. Paragraph 20 of the Agreement provides that: "No provision of this Agreement may be amended, supplemented or waived other than by means of a writing signed by you [Cultural Assets II], SFS and Sotheby's."

29. The Agreement at paragraph 21 contains a merger clause, which provides as follows:

This Agreement, including the Schedule hereto, the Terms of Guarantee and Conditions of Sale, contains all of the terms and provisions and constitutes the entire agreement

between the parties with respect to the subject matter hereof. This Agreement supersedes all prior or contemporaneous written, oral or implied understandings, representations and agreements of the parties relating to the subject matter of this Agreement.

30. Luckett agreed to the estimate ranges assigned to the items of the Collection that were ultimately published in the catalogue.

31. The initial estimates attached to the Proposal were, for the most part, supplied by Luckett.

32. The Proposal is not a binding contract. Rather, as noted on the very first page, the Proposal was Sotheby's "suggestions for the marketing and promotion" of the sale of the Collection.

33. Nevertheless, Sotheby's did virtually everything suggested in the Proposal.

34. The Agreement, which contains a merger clause strictly enforced under controlling New York law, is the only binding contract between plaintiff and Sotheby's.

35. The Agreement was negotiated by Luckett, an experienced, well-counseled businessman, on behalf of Cultural Assets II.

36. An educational symposium concerning the Collection took place on October 17, 1997 at Sotheby's in New York. Lonn Taylor of the Smithsonian Institution,

a well-known and respected scholar of whom Luckett approved, spoke at the educational symposium.

37. The educational symposium was precisely what Luckett wanted and Sotheby's described in the Proposal.

38. Sotheby's generated media coverage concerning the Collection and the auction, including the following:

PRINT:

Santa Fe New Mexican. August 16,1997.
New Mexican. November 1997.
Los Angeles Times. November 5, 1997.
Albuquerque Tribune. December 26, 1997.
Antiques and Collectibles. December 1997
Accent West/Amarillo. December 1997
House Beautiful. January 1998
Maine Antique Digest. January 1998
Antiques & The Arts Weekly. January 2, 1998
New York Times. January 9, 1998
Philadelphia Inquirer. January 9, 1998
Boston Sunday Globe. January 11, 1997

TELEVISION:

Wall Street Week With Louis Rukeyser-PBS-TV. December 19, 1997

39. Sotheby's exhibited highlights of the Collection during its fall sales in 1997.

40. The pre-auction exhibition took place at Sotheby's in New York, commencing on January 10, 1998.

41. The low catalogue estimate for the entire Collection, consisting of 247 lots, was approximately $1.58 million.

42. The low catalogue estimate for the lots that sold at auction was $1,054,200.

43. When the total buyers' premiums of $179,409 are added to the hammer price, the total paid by buyers at the auction of the Collection is $1,426,134.

44. As of August 14, 1999 -- the close of discovery -- a total of 37 additional lots from the Collection were sold post-auction for approximately $400,000. Those items had a low catalogue estimate of $390, 300.

45. The final catalogue was an excellent product, and is considered a landmark and research tool in its field.

46. The catalogues were mailed on a timely basis and the same time that catalogues for sales in mid-January are mailed every year.

47. There is no evidence that mailing the catalogues sooner would have changed the auction results.

48. All of the museums Luckett wanted to receive a catalogue were sent one.

49. The pre-auction exhibition was well done and well attended.

50. Sotheby's personnel were available at the pre-auction exhibition and discussed the Collection with potential bidders.

51. Sotheby's properly promoted and conducted the auction.

52. Plaintiff did not sustain any damages from any alleged breach or wrongdoing by Sotheby's.

## SOTHEBY'S PROPOSED CONCLUSIONS OF LAW

A. The merger clause in the Agreement is valid and enforceable.

B. The Agreement embodies the entire agreement between plaintiff and defendant.

C. In paragraph 1(d) of the Agreement, plaintiff agreed and acknowledged that the Collection "will be held and offered by Sotheby's as SFS' pledge agent at public auction." Hence, as a matter of law, any alleged acts undertaken by Sotheby's as SFS' pledge agent cannot constitute a breach of fiduciary duty.

D. Paragraph 10 of the Agreement provides for the imposition of the 20% service charge on the costs of services performed by others on behalf of plaintiff's account and paid for by Sotheby's. Sotheby's paid on behalf of plaintiff's account plaintiff's share of the costs of the auction catalogue and, therefore, in accordance with the Agreement Sotheby's properly charged plaintiff the 20% service charge -- approximately $7,000. Consequently, there was no breach of contract by Sotheby's.

E. Paragraph 16 of the Agreement authorizes Sotheby's to revise estimates "from time to time in its sole discretion." Hence, as a matter of law, Sotheby's revisions of estimates for the Collection cannot constitute a breach of fiduciary duty.

F. Sotheby's has not breached any provision of the Agreement nor any duties created by, or arising from, the execution of the Agreement.

G. Under the circumstances, Sotheby's used its best efforts to market and promote the auction of the Collection and otherwise acted in a reasonable manner commensurate with its skill and expertise. Accordingly, Sotheby's was not negligent and did not breach its fiduciary duty, if any, to the plaintiff.

Dated: January 4, 2001

                              Respectfully submitted,

                              RODEY, DICKASON, SLOAN,
                                AKIN & ROBB, P.C.

                              By: _/s/ William S. Dixon_____
                                   William S. Dixon

                              Albuquerque Plaza

                              201 Third Street, N.W., Suite 2200
                              Albuquerque, New Mexico 87103
                              (505) 768-7266

                              - and –

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              (212) 310-8000

                              ATTORNEYS FOR DEFENDANT
                              SOTHEBY'S, INC.

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing document was served on the 4th day of January, 2001 upon Randolph B. Felker, Esq., Felker, Ish, Ritchie & Geer, P.A., 911 Old Pecos Trail, Sante Fe, New Mexico 87501, by Federal Express, overnight delivery and telecopier.

*William S. Dixon*
William S. Dixon